IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 04-69 |
| | ) | |
| KEITH HOLT, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

CONTI, District Judge.

Defendant Keith Holt ("Holt" or "defendant") was indicted on April 1, 2004, on one count of carjacking on or about January 15, 2003, in violation of 18 U.S.C. § 2119, one count of possession of a gun during the commission of a felony, on or about January 15, 2003, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), and one count of possession of firearm by a convicted felon, on or about January 15, 2003, in violation of 18 U.S.C. § 922(g)(1). A superseding indictment was filed on September 14, 2004, charging defendant with one count of carjacking on or about January 15, 2003, in violation of 18 U.S.C. § 2119(2), one count of possession of a gun during the commission of a felony, on or about January 15, 2003, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), and one count of possession of firearm by a convicted felon, on or about January 15, 2003, in violation of 18 U.S.C. § 922(g)(1).

Defendant filed six pre-trial motions with this court on May 4, 2005. The government filed an omnibus response to these motions on June 3, 2005. A suppression hearing was held on July 5, 2005. The court ruled on five of defendant's motions on the record at that hearing. Still pending before the court is a motion to suppress an eyewitness identification (Docket No. 46). After the suppression hearing, defendant and the government each submitted proposed findings of fact and conclusions of law regarding the motion to suppress the eyewitness identification and

the record was closed on October 3, 2005.  Defendant argues that the eyewitness identification

made by Moon on January 21, 2003 should be suppressed because the photo array was unduly

suggestive and the identification is not reliable.  The government disagrees and argues that the

photo array procedure did not violate the due process standard.

On this 27th day of October 2005, the court makes the following findings of fact

and conclusions of law with respect to defendants' motions to suppress evidence:

## I.     Findings of Fact

### A.     The January 15, 2003 Incident

1.     Gene Moon ("Moon") was the victim of a carjacking and a shooting on January 15, 2003

at 2:30 a.m.  Transcript of hearing dated July 27, 2005 ("Tr.") at 88.  On that evening,

Moon was returning home from work and pulled into a parking space in a lot near his

apartment building.  Id. at 89, 127, 129.  Moon parked near the garbage bins in the

parking lot.  Id. at 126.  Lights from Moon's apartment building illuminated the parking

lot.  Id. at 125.  One of the building lights was placed in the garbage bin area and another

placed near the door of the building.  Id. at 127. That area is about eight to twelve steps

from the apartment building.  Id. at 127, 129.  As he opened the door of his car, Moon

was approached by a man pointing a gun.  Id. at 89-90.  The man ordered Moon to

remove his wallet and exit the vehicle.  Id. at 90.  Moon was told to turn around and lay

down on the ground.  Id.  at 90, 117-118.  At first, the assailant was behind Moon's left

shoulder.  Id. at 118.  Moon eventually turned around and faced his assailant.  Id. at 118.

The two men circled each other as they conversed.  Id. at 120.  Moon and the assailant

2

conversed for a period of up to ten minutes. Id. at 91. During the conversation, Moon's eyeglasses were knocked off. Id. at 91-92. This event occurred early in the altercation. Id. at 117. Moon's eyeglasses were used for distance vision and driving. Id. at 121-22, 124-125. He did not need the eyeglasses to see things close to him. Id. at 122. Moon did not have cataract problems at the time. Id. at 88-89. He did have a procedure to treat a cataract problem prior to January 15, 2003. Id. at 89. During the conversation, Moon moved closer to the assailant, reached for the assailant's gun and grabbed his arm. Id. at 120-21. At some point, Moon was shot in the stomach by the assailant. Id. at 92.

**B.     The Investigation**

2.     Subsequent to the shooting, Moon's first contact with law enforcement authorities was an interview with the Wilkinsburg, Pennsylvania police department. Id. at 50. Moon described his assailant to the Wilkinsburg police as standing five feet, seven inches or five feet, eight inches, wearing glasses and a hooded sweatshirt or "hoodie" or an Army fatigue jacket. Id. at 50, 92. Moon was not able to see how much facial hair his assailant wore due to the hood of the assailant's sweatshirt being pulled tight around his face. Id. at 105. Moon was able to see his assailant eye to eye. Id. at 93. Moon did not indicate that he recognized or knew his assailant during that first interview. Id. at 51, 93.

3.     The lead investigator in the case was Timothy Skoog ("Skoog"), a detective with the Allegheny County Sheriff's Department. Tr. at 36, 46, 54. Skoog has been assigned to the Federal Bureau of Investigation's ("FBI") Violent Crimes Squad since 1999. Id. at 36. Skoog's office is located in the FBI office building in Pittsburgh. Id. at 46. Skoog received training on developing photo arrays from the Allegheny Police Academy in

3

1992, as well as through FBI training seminars in 2001.  Id. at 46-47.  Skoog generated by computer the photo array used by Moon to identify defendant.  Id. at 36-37, 40.

4.      Skoog initially interviewed Moon on January 16, 2003.  Id. at 51.  Moon again gave a description of his assailant.  Id. at 52.  Moon described his assailant as being in his 30's, five feet, eight inches, or five feet, nine inches tall.  Id. at 52.  Moon did not indicate that he knew or recognized his assailant.  Id. at 52.  Moon does not recall talking to Skoog on January 16, 2003.  Id. at 93-94.  Skoog next interviewed Moon on January 21, 2003.  Id. This interview occurred after Moon was upgraded to stable condition at the hospital.  Id. at 53.  During this interview, Moon indicated to Skoog that, upon reflection, Moon believed he had seen his assailant prior to January 15, 2003.  Id. at 54, 96.  Moon told Skoog that he believed that his assailant had lived in the same building as Moon, that the assailant used to assist the maintenance man in cleaning up the building, and that the assailant was evicted from the building for selling narcotics out of an apartment.  Id. at 38, 54, 59-60, 96-97.  Moon did not identify defendant by name.  Id. at 37, 54.  Moon told Skoog to speak to the building manager, Joy Van Kirk,  and she would know the suspect's name.  Id. at 54, 60.

5.      Upon completion of the interview with Moon at the hospital, Skoog immediately traveled to Moon's apartment building to speak with the building manager.  Id. at 37.  The building manager identified Holt as the man described by Moon.  Id. at 37-38.  Skoog searched for defendant's name through an FBI database and found that defendant had an arrest record.  Id. at 38.   A photograph of defendant was found within those FBI records.  Id. at 39.  Skoog proceeded to the Allegheny County/City of Pittsburgh Bureau of

4

Criminal Identification and accessed the computer database used to set up photo arrays. Id. at 37. The database accesses the picture of a suspect, places it randomly into the photo array, and places photos of seven other people with similar facial identifiers and characteristics into the array. Id. at 37, 56. The purpose of the program is to insert seven other pictures that are similar to the picture of the suspect. Id. at 56. That computer program was used to create the photo array at issue in this case. Id. at 40. Skoog used the description that Moon gave on January 21, 2003, and his conversation with the building manager as the basis for the formulation of the photo array. Id. at 73. Defendant's photograph is the first photograph in the array. Id. at 49; Government's Ex. 1. Skoog had no control where defendant appeared in the photo array; the order was generated randomly by the computer. Tr. at 50. Skoog also could not move pictures in the array from space to space. Id. at 50. In order to ensure defendant's picture was not the first one in the photo array, Skoog could have started over and created a new one. Id. at 61. None of the men pictured in the photo array are wearing glasses. Id. at 56. Skoog had no picture of Holt wearing glasses at the time of the creation of the photo array. Id. at 56-57. Skoog did not have the ability to place glasses on the picture of defendant. Id. at 57. Moon never mentioned facial hair in any of his descriptions to law enforcement authorities. Id. at 59. All of the men pictured in the photo array have facial hair. Id. All of the men pictured in the photo array are African-American and all are wearing substantially similar clothing. Id. at 184.

### C.    The Identification Procedure

6.    Moon talked to family members and friends on January 21, 2003, prior to being shown

the photo array.  Id. at 99.  Moon told family members that he remembered the face of his

assailant prior to being shown the photo array.  Id. at 99-100.  Skoog showed the photo

array to Moon on January 21, 2003.  Id. at 41.  At the time Skoog presented the photo

array to Moon, Holt was Skoog's chief suspect.  Id. at 49, 64-65.  Prior to showing Moon

the photo array, Skoog instructed him that the suspect may or may not be in the photo

array.  Id. at 42.  Skoog told Moon:  "If you do identify somebody that you think or

somebody that you–that committed the crime, tell me about it and then initial and date the

photograph."  Id. at 42, 100.  Prior to showing Moon the photo array, Skoog did not show

Moon any photos of defendant, nor did he indicate that he had identified Holt as a

suspect.  Id. at 60.  Skoog also did not tell Moon the name of defendant prior to the

identification.  Id. at 106.  Moon immediately identified the picture in the first

photograph, that of defendant, as the assailant and stated:  "Put a square pair of glasses on

him and that's him."  Id. at 42, 104. The fact that none of the photos contained men

wearing glasses did not make it more difficult for Moon to pick out the assailant.  Id. at

102.  Moon then looked at another picture and stated:  "He looks familiar.  He looks like

somebody I might know from work or somewhere like that."  Id. at 60, 67, 106, 107, 111

Moon also indicated the man in photo number four may have lived in Moon's

neighborhood.  Id. at 107, 111.  Moon affixed his initials and the date next to both

photographs.  Id.; Government's Ex. 1.  There is no difference in the way that Moon

initialed and dated the two photographs.  Tr. at 64; Government's Ex. 1.  Moon did not

indicate that the second person, identified in photograph number four, had anything to do with the carjacking.  Tr. 44.  The man in photograph number four told Skoog that he did not know someone with Moon's name.  Id. at 67.  While prior to the identification Skoog did not tell Moon the name of the person he identified in the photo array as his assailant or present him with any names or identifiers, it is possible that Skoog told Moon the name of defendant after the identification.  Id. at 69-70, 112.  Moon recalls this possibly occurring after he was discharged from the hospital, but it could have been as early as the day Moon made the identification.  Id. at 115, 116.  Moon clearly recalls that he was not told Holt's name prior to the identification.  Id. at 115.  Skoog did not tell Moon that he had spoken with the building manager at Moon's residence.  Id. at 70.  Moon was not wearing glasses at the time of identification.  Id. at 62, 113.  Skoog did not videotape or audiotape the presentation of the photo array.  Id. at 64.  Skoog did not use another agent – one who did not know who the suspect was – to conduct  the photo array.  Id. at 65.  Skoog did not have Moon fill out a form indicating his level of confidence in his identification.  Id. at 66.

### D.      The Testimony of the Defendant's Expert Witness

7.      At the suppression hearing, defendant called David Ross ("Ross") as a witness.  Id. at 130.  Ross is a professor of psychology at the University of Tennessee at Chattanooga.  Id.  Ross has a Ph.D. in social psychology from Cornell University.  Id. at 131.  Ross has been a research psychologist for twenty years and studies the accuracy of eyewitness and line-up identifications.  Id.  Ross is a member of the American Psychological Association, the American Psychology and Law Society, and the Society for the Study of Applied

7

Memory and Cognition.  <u>Id.</u> at 133.  Ross' Ph.D. thesis was directed toward

understanding an error in memory that occurs when witnesses mistakenly identify an

innocent person from a line-up.  <u>Id.</u> at 139, 143.  During the suppression hearing, the

court admitted the testimony of Ross as an expert in the field of cognitive memory and

eyewitness identification.  <u>Id.</u> at 144.

8.  Ross identified two sets of published guidelines on how to conduct photo line-ups.  <u>Id.</u> at

146.  One set of guidelines was published in 1998 by the American Psychology and Law

Society.  <u>Id.</u>; Defendant's Exhibit A ("Def.'s Ex. A).  Those guidelines are entitled

"Eyewitness Identification Procedures, Recommendations for Line-ups and Photo

Spreads."  Tr. at 131; Def.'s Ex. A.  Those guidelines were published in the *Journal of*

*Law and Human Behavior* in 1998, Volume 22, Number 6.  Tr. at 147; Def.'s Ex. A.  The

*Journal of Law and Human Behavior* is not distributed to police officers.  Tr. at 176.

Those guidelines were completed by a panel of psychologists as "commissioned" by the

American Psychological Association.  <u>Id.</u> at 147.  The purpose of the guidelines is to

improve the accuracy of line-up identifications.  <u>Id.</u>  The second set of guidelines is

*Eyewitness Evidence: A Guide for Law Enforcement.*  <u>Id.</u> at 152; Def.'s Ex. B.  Both of

these guidelines provide detailed instructions on procedures and safeguards that can be

used to help improve the accuracy of line-up identifications.  Tr. at 147-52, 154-60.

9.  Ross, in reviewing the photo array in this case, stated that there were several areas in

which the identification in this case did not satisfy all of the recommendations in the two

guidelines.  <u>Id.</u> at 163-65, 167-73.  In viewing the photo array, Ross admitted that the fact

that none of the photos depicted men wearing glasses did not suggest to Moon that he

should identify defendant over the others pictured.  Id. at 182.  Ross made the same

admission with regard to the fact that none of the pictures contained a photo of a man in a

hooded sweatshirt and with regard to the fact that all of the pictures contained men with

facial hair.  Id. at 183.  Ross testified that the fact that the men in the photo array do not

match the description given by Moon in the first two interviews does not suggest that

Moon should have selected defendant's picture over the others in the photo array.  Id. at

188.


II.     **Conclusions of Law**

        **A.      The Applicable Legal Framework**

1.      The Fifth Amendment to the Constitution of the United States of America provides in

        relevant part:  "No person shall be...deprived of life, liberty, or property without due

        process of law...."  U.S. CONST. Amend. V (the "due process clause").  A pre-trial

        identification procedure violates the Fifth Amendment to the United States Constitution's

        due process clause if it is "so impermissibly suggestive as to give rise to a very substantial

        likelihood of irreparable misidentification."  Simmons v. United States, 390 U.S. 377,

        384 (1968).

2.      The United States Court of Appeals for the Third Circuit has held that, in light of more

        recent United States Supreme Court precedent, the standard should be "a substantial risk

        of misidentification," not a "very substantial" one.  United States v. Emanuele, 51 F.3d

        1123, 1128 (3d Cir. 1995).  "We conclude that our most recent statement of the standard,

        that of Riley, like our phrasings in Stevens and Dowling, most accurately reflects

Supreme Court precedent.  Thus, we must decide whether there exists a 'substantial risk of misidentification.'"  Id.  If an identification violates that standard, it must be excluded at trial.  Neil v. Biggers, 409 U.S. 188, 196 (1972); Foster v. California, 394 U.S. 440, 442 (1969); Burkett v. Fulcomer, 951 F.2d 1431, 1448 (3d Cir. 1991)(citing to Simmons). When challenging an identification procedure, the defendant has the burden of proving that the identification procedure was impermissibly suggestive.  United States v. Lawrence, 349 F.3d 109, 115 (3d Cir. 2003) (citing to Reese v. Fulcomer, 946 F.2d 247, 259 (3d Cir. 1991)).

3.      The relevant inquiry for the district court is to determine a) whether the photo array procedure was unnecessarily suggestive and, b) if so, whether the corrupting influence of the procedure is so suggestive that it outweighs the reliability of the identification. Burkett, 951 F.2d at 1448 (citing to Manson v. Brathwaite, 432 U.S. 98, 114 (1977); see Biggers, 409 U.S. at 198 (holding that suggestiveness alone is not enough to exclude an identification, but must be measured under a totality of the circumstances test).  "A suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability...."  Brathwaite, 432 U.S. at 106.

4.      The court finds that the guidelines discussed by Ross, while valuable in helping to ensure increased accuracy in eyewitness identifications, do not reflect the constitutional parameters of a valid photo array and identification.  This court is tasked with determining whether the eyewitness identification in this case violates the applicable standards of due process.  Law enforcement personnel must conduct the eyewitness

identification in a manner which does not violate a defendant's right to due process. Here, there is no evidence that the guidelines established base line standards for a constitutionally permissible eyewitness identification procedure.  Rather, the guidelines describe what appears to be the best practices for eyewitness identification.  Thus, the guidelines and Dr. Ross's testimony do not establish that the eyewitness identification in issue was constitutionally defective. The guidelines and Dr. Ross's testimony may affect the weight to be afforded to the identification, but do not establish that the identification violated defendant's right to due process.

**B.      Suggestive Nature of the Photo Array**

5.      Courts have held that factors to be considered when inquiring into whether a photo array is impermissibly suggestive include: the size of the array, the manner of its presentation by law enforcement officers, and the details of the photographs themselves.  United States v. Wiseman, 172 F.3d 1196, 1208-09 (10th Cir. 1999); United States v. Sanchez, 24 F.3d 1259, 1262 (10th Cir. 1994).

6.      The court finds that under those factors the photo array in this case was not impermissibly suggestive.  A review of the array itself convinces this court that defendant's picture is not substantially different from the others.[1]  The photo array shown to Moon contained eight pictures.[2]  All of the pictures depicted African-American men with facial hair.  The

---

[1]A court's review of the array and opinion on the difference or similarities in the appearance of the suspects is a valid factor to consider when deciding if an identification is overly suggestive.  See Sanchez, 24 F.3d at 1263.

[2]At the suppression hearing, defendant's expert, Ross, criticized Skoog's use of a simultaneous photo array, in which a sheet containing 8 photographs was shown to Moon at one time.  Ross opined that a better option would be to use a sequential method in which individual

clothing worn by the men in each of the pictures was substantially similar.  None of the

men in the array wore eyeglasses and none were depicted wearing a hooded sweatshirt.

In fact, defendant's own expert admitted at the suppression hearing that the lack of

eyeglasses and sweatshirts in no way suggests that Moon should have selected defendant

over any of the others pictured in the array.[3]  All eight photos in this case appear to be

face shots of men with similar characteristics, i.e., with facial hair, etc., and thus common

sense suggests that the array did not suggest that defendant would be more likely to be

identified.  The United States Court of Appeals for the Third Circuit held that a photo

array that depicted five suspects in "mug shots" and only the defendant in a personal

photo was not impermissibly suggestive.  Lawrence, 349 F.3d at 116.  The court in

Lawrence found that "common sense suggests that a witness is less likely to identify a

personal photo than one appearing to be a 'mug shot' that would suggest a prior police

record when witnesses are asked to select a picture...."  Id.

---

photos of suspects would be shown to Moon.  The court of appeals directly addressed this issue
in Lawrence.  349 F.3d at 115.  "We can reject out of hand Lawrence's attempt to suggest that
using an array consisting of six photographs reproduced on a single page as opposed to
presenting individual pictures to witnesses serially would somehow prejudice a defendant.  To
the contrary, it appears to us that showing all of the photographs at once can be a *very fair way to
proceed* depending on all circumstances surrounding the identification."  Id. (emphasis added).

[3]The photo array in this case stands in contrast to the array described in Wiseman.  172
F.3d at 1208-09.  The court in Wiseman found the photo array used in that case to be unduly
suggestive.  Id.  That array depicted the defendant with dark circles under his eyes and a
unnatural chalk-like skin tone, as compared to the others pictured.  Id.  In addition, all subjects in
the array, except for the defendant, wore a thin chain around their necks.  Id.  Finally, some of the
witnesses, prior to making an identification, were told that a suspect had been arrested.  Id.

7.      The court also finds that the procedure used by Skoog in presenting the photo array to

Moon was not impermissibly suggestive.  Prior to the identification, Skoog did not tell

Moon the name of defendant, nor did he tell Moon that he had spoken to the apartment

building manager.  In his testimony at the suppression hearing, Moon was steadfast in his

belief that Skoog never told him Holt's name prior to the review of the photo array.  The

testimony at the suppression hearing showed that Skoog instructed Moon to review

carefully the array and asked him if he could identify the person that shot him.  The court

finds no evidence that Skoog instructed or suggested that Moon pick defendant out of the

line-up, emphasized a particular photograph or told Moon which picture depicted

defendant[4].

8.      Defendant argues that Skoog's placement of defendant in the first position in the photo

array makes the array impermissibly suggestive.  The court disagrees.  Skoog testified

that he created the photo array using a computer program.  He did not deliberately place

defendant in the first position.  In addition, being in the first position alone, absent other

factors that would suggest that Moon should select defendant, does not, by itself, support

a finding that the array was impermissibly suggestive.  While it is certainly possible that a

photo array listing defendant first, along with other significant suggestive characteristics,

could lead to a finding that an array is impermissibly suggestive, the court finds that the

mere fact that defendant is placed first in the array does not, by itself, cause the array to

_____

[4]"[S]howing a witness a photographic array can constitute a denial of due process when
police attempt to emphasize the photograph of a given suspect, or when the circumstances
surrounding the array unduly suggest who an identifying witness should select."  Lawrence, 349
F.3d at 115.

be impermissibly suggestive.  The fact that the characteristics of each suspect depicted in the array are substantially similar and that Skoog was not suggestive during the identification procedure compels the court to find that the array was not impermissibly suggestive.

9.    Defendant also raises questions about the fact that Moon initialed two photos on the array.  The court finds that this fact does not indicate that the array was impermissibly suggestive.  The testimony of both Skoog and Moon was that Moon immediately identified defendant as his assailant.  Both men also testified that Moon recognized another of the men pictured in the array.  Skoog and Moon testified that Skoog instructed Moon to also initial the second  photo.  There is no evidence to suggest that either Skoog or Moon did anything improper during the identification procedure.  This court further finds that the existence of two sets of initials serves to support the reliability of the identification.  First, the fact that Moon recognized a second man in the photo array indicates to this court that Moon carefully reviewed and studied all of the pictures in the array.  The court concludes that this fact supports the conclusion that Moon was not steered towards defendant's photo by Skoog.  Second, the court finds that Skoog's instruction to Moon to initial the photo of the second man he recognized as a reflection of an effort by Skoog to ensure fairness and accuracy in the identification.  Skoog admitted that, prior to showing Moon the photo array, defendant was his prime suspect.  An identification of defendant by Moon only served to support that determination.  Skoog's instructing Moon to initial the photo of another man he recognized supports the conclusion that the identification was not impermissibly suggestive.

14

**C.      Reliability of Identification**

10.      Even if this court had concluded that the photo array was suggestive, the court would still

need to consider the totality of the circumstances in determining whether defendant's

right to due process was violated.  Specifically, the court would need to determine

whether the identification procedure was reliable.  The United States Supreme Court held

in Biggers that challenges to identifications are to be reviewed by district courts under a

totality of the circumstances test.  Biggers, 409 U.S. at 198; see Manson, 432 U.S. at 116

("We therefore conclude that reliability is the linchpin in determining the admissibility of

identification testimony for both pre- and post-Stovall confrontations.  The factors to be

considered are set out in Biggers.").   In Biggers, the United States Supreme Court set

forth five factors for courts to consider in evaluating the likelihood of misidentification.

Those factors are: (1) the opportunity of the witness to view the criminal at the time of the

crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior

description of the criminal; (4) the level of certainty demonstrated by the witness at the

identification; and (5) the length of time between the crime and the identification

procedure.  Biggers, 409 U.S. at 199.[5]  Determinations under these factors are fact

intensive and each case must be considered on its own facts.  See Simmons, 390 U.S. at

971.

---

[5]The United States Supreme Court and the United States Court of Appeals for the Third
Circuit have both instructed that courts evaluating eyewitness identifications are *not* to consider
evidence of the defendant's guilt, but may only consider factors relating to the reliability of the
identification.  Brathwaite, 432 U.S. at 116 (holding that evidence of a defendant's guilt "plays
no part in our analysis" whether an identification violates due process); Emanuele, 51 F.3d 1128
(quoting Brathwaite).

11.     The first factor to be considered is the opportunity for the witness to view the criminal at the time of the crime.  This factor weighs heavily in favor of the government.  Moon testified that his assailant and he circled each other and spoke for up to ten minutes.  Moon also testified that he was close enough to his assailant to grab his arm and attempt to pull the gun out of the assailant's hand. While Moon's eyeglasses were knocked off during the altercation, Moon testified that he actually saw better at close range without his glasses.  In addition, Moon testified that, while the incident occurred at 2:30 A.M., the parking lot behind his apartment building – the place where the incident occurred – was illuminated by two different lights and he had no problem viewing his assailant.

12.     The second factor to be considered is the witness' degree of attention.  This factor also weighs heavily in favor of the government.  Perhaps Moon's own words at the suppression hearing best illustrate his degree of attention.  "Have you ever had a gun pointed at you?  You don't really have a sense of time, and you don't know if it's one minute, two minutes, ten minutes, fifteen minutes, an hour."  Tr. at 91.  The court finds that Moon's attention was extremely focused as he spoke and circled his assailant for up to ten minutes, all while having a gun pointed at him.

13.     The third factor for the court to consider is the accuracy of the witness' prior description of the criminal.  In this case, Moon's description of his assailant supports defendant's contention that the identification is unreliable.  First, Moon described his assailant as being between five feet, seven inches tall and five feet, nine inches tall.  Holt is taller than those descriptions.  Second, Moon also testified that his assailant wore eyeglasses.  Holt is not depicted in the photo array wearing eyeglasses.  Third, Moon gave no indication

16

that his assailant wore facial hair in his interviews.  The court does note that Skoog created his photo array based not upon the two descriptions given by Moon on the day of the incident, but rather, Skoog testified that he created the photo array based upon Moon's later statement that he recognized his assailant as a man that used to live and work in his apartment building.  While this factor supports defendant's argument – the court in reviewing this factor in the totality of the circumstances, finds that it does not mandate that the identification be suppressed; rather, it may affect the weight a jury may afford the evidence at trial.

14.    The fourth factor to be considered by the court is the witness' level of certainty demonstrated by the witness at the time of the identification.  The evidence in this case shows that Moon was adamant that, if glasses are placed on defendant, he is the man that shot him.  There is no evidence of record to indicate to this court that Moon ever wavered from his conviction that defendant was his assailant.

15.    Finally, the fifth factor to be considered, as outlined in Biggers, is the length of time between the crime and the witness' identification.  The crime in this case occurred on January 15, 2003.  Moon identified defendant on January 21, 2003.  The court finds that a period of six days between the witness' contact with the perpetrator and the identification is not so long as to render the identification unreliable.

16.    Considering all the factors set forth in Biggers, the court concludes based upon the totality of the circumstances that the photo array and the procedures used in the eyewitness identification in this case "possessed sufficient aspects of reliability."

Brathwaite, 432 U.S. at 106.  Thus, even if the photo array had been suggestive, the right of defendant to due process was not violated.

**III.   Conclusion**

Holt did not meet his burden of proving that the identification procedure was impermissibly suggestive and his motion to suppress the eyewitness identification (Doc. No. 46) is **DENIED**.  An appropriate order will be issued.

By the court:

<u>/s/ Joy Flowers Conti</u>
Joy Flowers Conti
United States District Judge

Dated: October 27, 2005

cc:      Counsel of Record

18